REYNOLDS v. LEHIGH VALLEY R. CO.

(Supreme Court, Appellate Division, Fourth Department. December 29, 1911.)

1. MASTER AND SERVANT (§ 149*)—INJURIES TO SERVANT—NEGLIGENCE.

Where an experienced railroad engineer with knowledge that plaintiff was an inexperienced boy, just learning to be a brakeman, while on his fourth trip, directed him to drop off the engine when it was going at too high speed for safety, or to walk back over the train of loaded freight cars to the caboose, to get a pail to be used in putting out fire on a hot journal, and plaintiff, believing that he could jump from the running board in safety, did so, and was seriously injured, the engineer was guilty of actionable negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 291–295; Dec. Dig. § 149.*]

2. MASTER AND SERVANT (§ 286*)—INJURIES TO SERVANT—RAILROADS—SPEED OF TRAIN.

In an action for injuries to a brakeman by alighting from his train pursuant to a command of his engineer, held, that the speed of the train at the time was a question for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010–1050; Dec. Dig. § 286.*]

3. MASTER AND SERVANT (§ 289*)—INJURIES TO SERVANT—RAILROADS—CONTRIBUTORY NEGLIGENCE.

Plaintiff, a boy 19½ years of age, was employed as brakeman on a freight train. On the first half of his fourth trip, while riding in the engine, he was directed by the engineer in a loud voice to "drop off here," and go back to the caboose and get a pail with which to extinguish a journal fire. The engineer testified that the train was going between 25 to 30 miles an hour, and that his direction to plaintiff was to "mooch back" and get the pail, meaning that he should go back over the cars. Plaintiff, believing that he could safely alight, attempted to do so, and was injured. Held, that he was not guilty of contributory negligence as a matter of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

4. MASTER AND SERVANT (§ 180*)—INJURIES TO SERVANT—RAILROAD ENGINEER—VICE PRINCIPAL—STATUTES.

Where a railroad engineer had entire charge of the engine and of the train, and was not only in physical control of the engine, but had general authority over the plaintiff, his head brakeman, and the fireman, he was a vice principal, and not plaintiff's fellow servant, under the Barnes act (Laws 1906, c. 657), providing that a person who as a part of his duty has for the time being physical control or direction of the movement of an engine belonging to a railroad company is a vice principal and not a fellow servant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 359–368; Dec. Dig. § 180.*]

Williams, J., dissenting.

Appeal from Trial Term, Niagara County.

Action by Irving G. Reynolds, by Charles Reynolds, his guardian ad litem, against the Lehigh Valley Railroad Company. Judgment for plaintiff, and from an order denying defendant's motion for a new trial on the minutes it appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

James McCormick Mitchell, for appellant.

Augustus Thibaudeau and Eugene M. Ashley, for respondent.

SPRING, J. The plaintiff, a young man 19½ years of age, in the employ of the defendant as an extra brakeman, jumped off the running board of an engine on which he was at work about 7:30 o'clock in the morning of September 18, 1909, in the vicinity of La Salle, in the county of Niagara, and under the direction of the engineer of the train, and he fell and was run over by the train, and his leg was crushed so that it had to be amputated; and he charges that the defendant was responsible for his injuries.

The plaintiff had been reared on a farm until he was 17 or 18 years of age, and was then employed by the defendant in its roundhouse at Manchester, and his work consisted in blowing flues and running the turntable, and he had no experience in the operation of freight trains or in jumping on or off from them. In September, 1909, he applied to the yardmaster of the defendant at Manchester for the position of brakeman, and was permitted, without compensation, to go on the through freight train from Manchester to Niagara Falls, about 110 miles, with a view of learning the business of freight brakeman. He was on the train during three trial trips. The engineer in control of this freight train was a man named Orr, and the plaintiff did but little work while on these trial trips, and the regular brakeman performed the work under the direction of the engineer. The plaintiff, however, was directed by the engineer once or twice during these trial trips to jump off the running board of the train when it was in motion and when it was going slowly, and go back to the caboose on some errand to the conductor. After these trial trips, he was employed as an extra brakeman, and at the time he received his injuries was on the first half of the fourth trip. Orr was the engineer all this time, and he alone gave the orders to the plaintiff in the performance of his duties. The train was a through freight, containing 35 or 36 loaded box cars; and on the morning of the accident, before reaching tower 61 west of La Salle, the engineer was advised that there was a hot journal on the tender of his engine. Tower 61 was at the east end of a long siding and the next tower to the west was tower 61A, which was at the west end of this siding, and the distance between the two towers was about one mile. Upon receiving this information the engineer concluded he could not enter the siding at its easterly end, and so decided to pass beyond the westerly end of the siding and back in upon it and stop the fire in the hot journal. He was also induced to act in this way for the reason that an express train was following him from seven to ten minutes in the rear. He testified that his train was running at 25 or 30 miles an hour as it passed tower 61A, and he then shut off the steam. Just as the engine had passed the westerly end of the siding, he gave a direction to the plaintiff to go back to Rhodes, the conductor, and have him set out the "dope" pail in order that the plaintiff might pick it up and deliver it to the engineer to use in stopping the fire in the hot journal.

There is a controversy as to this direction. The plaintiff was in

the cab on the opposite side, and four or five feet distant from the engineer at the time the direction was given. The plaintiff testified that the engineer made his order as follows:

"Drop off here, and go back to the caboose, and tell Rhodes to set out the dope pail. We are going to back up here and pack our box."

The engineer's version of the direction is:

" 'Mooch back now, that journal is hot,' I says, 'mooch back and tell him, when we slow down, and get off and go back and tell the conductor when we get on the siding to set the dope pail out so we can pack that journal.' "

The plaintiff, understanding and believing that the direction called for immediate action, climbed down between the tender and the engine onto the running board, took hold of the rail with his right hand, looked carefully to see if there were any obstacles in the way, and, observing that the ground was level with nothing to interfere with his alighting and believing that he could do so with safety, jumped off. He ran along a short distance, was thrown to the ground, and injured in the manner above stated.

The few times which the plaintiff had, under the direction of the engineer, jumped from the train, it was going more slowly than on this occasion, although, as I have stated, he thought he was in no peril in jumping off. He had had very little experience in this business, and had received no instructions whatever, either from the engineer or from the conductor or from any one in fact, in regard to jumping off from the train. He had seen other brakemen do this frequently at the command of the engineer, although it does not appear that the train was running rapidly at any time the other brakemen were alighting from it. When the plaintiff alighted, he pursued the same manner adopted by his coemployés in getting off the running board and precisely as he had done the two or three times he had jumped off before. He knew nothing of this siding. The freight train on which he had been riding had never gone upon it, and he had no knowledge or information where it was located, and did not realize that the train was to back upon it.

No one testified to the order given by the engineer, except these two men, the plaintiff and Orr, the engineer. The latter testified that he did not expect that the plaintiff would get down on the running board and jump off the train when it was running rapidly. He further says that by the expression "mooch back" he intended that the plaintiff would walk back on the top of these 35 or 36 cars, and reach the caboose in that way. There is no hint that he ever explained to the plaintiff what the expression "mooch back" signified, and he does not seem to be very clear himself as to its signification; and the conductor is also in the dark as to the precise meaning of this forcible expression; nor did he advise the plaintiff not to get on the running board. The engineer testified that the train at this time was going from 25 to 30 miles an hour, and that it had not slacked at all since he shut off the steam at tower 61A, which is entirely credible, for the distance could only have been two or three rods for when Reynolds was found after the accident he was lying only eight or ten car lengths west of tower

61A. In fact, the engineer testified that the train had not begun to lessen its speed for two minutes after the direction he gave to Reynolds, which at the speed he said the train was going would carry it along nearly a mile. However, when this was made plain to him, he admitted he was confused as to the time and said it probably was not more than one minute, or even less than that.

[1] It would seem, therefore, as if this engineer was negligent in giving this instruction to the inexperienced brakeman. He knew the plaintiff's lack of experience, and yet, according to his own version, he gave a command which, he says, required him to walk along back on the top of these cars when the train was going 25 or 30 miles an hour; and the plaintiff testified, and it is not disputed, that he had never walked back on the top of the cars. Again, if the instruction meant that he was to get down on the running board and the train was running at the speed claimed by the engineer, the latter showed lack of judgment, and was negligent in giving this direction to the inexperienced boy.

[2] It becomes important, therefore, to consider the evidence bearing upon the rate of speed which this train was running at the time the command was given, and at the time the plaintiff jumped from the running board. The plaintiff gave no evidence upon this subject. He said he did not know how fast it was going, except he believed that he could jump off without imperiling his safety.

Kerchue, the section foreman, who was standing in front of the tool house, and about a mile from where the plaintiff was injured, testified that the train was going about 30 miles an hour when it passed him.

Biggar, who was the signalman at tower 61, testified that it passed that tower at 35 miles an hour. Ginther, who was the rear brakeman and had been for seven years employed in that capacity, testified that as it passed tower 61A it was going 25 miles an hour, and that when it stopped it was 8 or 9 car lengths from that tower. After a somewhat extended cross-examination, his attention was called to the fact by the court that he had not given the speed of the train eight or nine car lengths west of tower 61A. Thereupon the counsel for the defendant took him in hand, and asked him what speed the train was running at that point, which was at the point of the accident, and he answered, "Why, the train was running—well it was slowed down then to about ten miles an hour." And he was asked by the counsel if that was his best judgment, and he answered, "Yes, sir." This rear brakeman had testified that the train slowed down as it approached La Salle. In other words, it had commenced to slow down before it reached tower 61, or more than a mile east of the order given by the engineer to the plaintiff.

Rhodes, the conductor, who was in the caboose, says the train was going from 20 to 25 miles an hour when the plaintiff was getting down toward the front of the train, although he also says that the slack was being taken up at tower 61, indicating that the train was coming to a stop.

Sayer, the fireman, testified that the train was going 25 miles an hour when the direction was given to the plaintiff.

On behalf of the plaintiff on rebuttal, Linderbolt was called as a witness. He had been a locomotive engineer in the employ of the defendant for 16 years, and he had made this run very frequently. He testified that this loaded train could not have been stopped, if running at the speed of 20 or 25 miles an hour, in less than two or three train lengths.

I am of the opinion that the physical facts indicate that the employés of the defendant have given an excessive rate of speed to this train. In the first place, it is to be borne in mind that the engineer intended to back on the siding and he was influenced in doing this by two things: First, the hot journal; and, second, the overpowering necessity of avoiding the express train which was following him only a few minutes in the rear. In order to accomplish this purpose, it would be expected that he would stop his train as soon as possible after the caboose had passed the west end of this siding. He testified, however, that he did not even shut off the steam until he reached tower 61A, which was close to this end of the siding, and that there was no diminution in the speed of his train when the plaintiff jumped off. He further testified that he did not apply the emergency brake or make any effort to check the train other than as already stated until he was advised by the fireman that the plaintiff had been hurt. He then applied the emergency brake, using his utmost effort to stop the train, and with all that effort the caboose passed the point where the plaintiff was injured several car lengths. It seems plain, therefore, that, if there had been no unusual attempt made by the engineer in response to the information from the fireman that the plaintiff had been injured, the train would have gone much farther toward the west. It appears to be reasonable that the witnesses who testified that the engineer caused the train to begin to slack its speed a mile or more back at tower 61 were testifying to the truth, for that course seems to be consistent with good railroading, in view of the fact that the engineer intended to back on the siding, both to avoid the express train and to stop the fire in the journal. Again, as testified to by the engineer, Linderbolt, it does not seem possible, if this heavily loaded freight train was going a slight downgrade at 25 miles an hour when the plaintiff dropped off the running board, that it could have been stopped in its length, or 1,500 feet. So I think it was a fair question of fact as to the speed of this train; and we then come down to the other questions. First, was the plaintiff guilty of contributory negligence as matter of law in jumping off from this train, assuming that it was going at the rate of ten miles an hour?

[3] There are several circumstances which must be considered upon this branch of the case. In the first place, we have his inexperience; that he did not fully apprehend the danger to him in jumping from the train going at that speed. An experienced brakeman who had frequently jumped off from the running board could have made this jump probably in safety.

Another thing essential to consider in passing upon his conduct is the command that was given by the engineer. He knew that the engineer was a man of experience, and he was entitled to accept the judgment of his superior upon that subject. As he reasonably construed the command which was given to him, it meant that he was to alight immediately, and that it was important that he proceed to the rear of the train at once. The direction was that he "get off here," and the engineer testified that he gave the order in a very loud tone of voice, as he expressed it, he "yelled loudly," which added to the emphasis and the importance of the command it was his duty to perform. While that direction did not relieve him from exercising prudence and caution, it did add the weight of the engineer's experience, which inevitably would influence his action in some measure. If the engineer said it was safe, he might reasonably think he was in no peril in jumping off.

In Northern Pacific R. R. v. Egeland, 163 U. S. 93, at page 98, 16 Sup. Ct. 975, at page 977 (41 L. Ed. 82), the plaintiff was a common laborer, a man of mature age, and he with other coemployés was directed to jump off at a station when the train was moving at four miles an hour. The plaintiff jumped from the platform about a foot lower than the car step, and was injured. The United States Supreme Court held that he was not guilty of contributory negligence as matter of law; and in its opinion the court states the rule as follows:

"If the plaintiff reasonably thought he could with safety obey the order by taking care and jumping carefully, and if because of the order he did jump, the jury ought to be at liberty to say whether under such circumstances he was or was not guilty of negligence. If the train had been going at the rate of 30, or even 15, miles per hour, the chance of injury resulting from a jump would have been so great that plaintiff would probably have obeyed such an order at his own risk."

So in Texas Central R. R. Co. v. Hicks, 24 Tex. Civ. App. 400, at page 401, 59 S. W. 1125, at page 1126, the plaintiff, an inexperienced section hand, was directed by the section foreman to alight from a train running from seven to twelve miles an hour, and obeyed the instruction. The command was that he "get off," which he assumed was imperative, and the court in considering his conduct said:

"If so, he had the right to assume that the master, the foreman, knew the danger, and that he would not order him to perform an act that he could not safely perform, and we cannot say, in the light of the evidence, that his act in getting off was so obviously dangerous as to preclude the recovery."

So also in Ballard v. Chicago, R. I. & P. Ry. Co., 51 Mo. App. 453, at page 459, where there was a similar direction, the court said:

"If the plaintiff jumped from defendant's train while in motion in obedience to the order of defendant's boss, and in doing so he was hurt, this would not bar his right of recovery, unless the danger to be incurred in so obeying the order of defendant's boss was so glaring that a reasonably prudent person would not have undertaken it."

The appellant's counsel has cited quite a large number of cases in this state to the effect that, where the plaintiff jumped on or off a moving train, he was held to be chargeable with contributory negli-

gence. A few of these I will advert to. In Solomon v. Manhattan R. R. Co., 103 N. Y. 437, 9 N. E. 430, 57 Am. Rep. 760, the gate of the railroad was closed, and the plaintiff, a passenger, attempted to get on board and was injured, and, of course, the court held he was guilty of contributory negligence. In Hunter v. C. & S. V. R. R. Co., 112 N. Y. 371, 19 N. E. 820, 2 L. R. A. 832, 8 Am. St. Rep. 752, and again in 126 N. Y. 18, 26 N. E. 958, 12 L. R. A. 429, the plain-tiff, a passenger, was attempting to board a moving train, and con-tributory negligence was imputed to him. In Mearns v. Central R. R. of N. J., 163 N. Y. 108, 57 N. E. 292, the plaintiff stepped off a mov-ing train without any intimation that he should do so or that the train had stopped, and he was held to be careless. In each of these cases cited by the appellant's counsel, so far as I have examined, the plaintiff was a passenger who was not acting in pursuance of any direction of any employés of the defendant railroad company. As the evidence here shows, the brakemen were frequently in the habit of jumping off from moving trains, and it is within the knowledge of us all that such action is very common among railroad employés. They not only do this voluntarily, but also in compliance with specific directions of their superiors, and that was so in this instance.

[4] In the second place it is claimed that the engineer was not a vice principal within the Barnes act, so called. Chapter 657 of the Laws of 1906, and which is the so-called Barnes act, in referring to the kind of officers or employés who are within its provisions, adds:

"Who are entrusted by such corporation or receiver, with the authority of superintendence, control or command of other persons in the employment of such corporation or receiver, or with the authority to direct or control any other employé in the performance of the duty of such employé, or who have, as a part of their duty, for the time being, physical control or direction of the movement of a signal, switch, locomotive engine, car, train, or telegraph of-fice, are vice principals of such corporation or receiver, and are not fellow serv-ants of such injured or deceased employé."

It seems to me, without the citation of any authority, that an en-gineer in charge of a train, and who has in his care the head brakeman and also under his direction the fireman, must necessarily be exercising "superintendence, control, or command" over these people. He must also have "physical control or direction" of the engine which he is oper-ating and of the signals which he gives, so that within the express verbiage of the statute I think he was a vice principal.

The rules offered in evidence, while they vest the conductor with general authority in the management of the train, do not assume to deprive the engineer of the physical control of his engine. The con-ductor was in the rear of the train in the caboose. In an emergency, such as existed here, the engineer could not communicate with the conductor, and have him give the command to the plaintiff. There are a large number of sections in the rules of the defendant defining the authority of an engineman, running from 864 to 875, quoted in the respondent's brief, and he is vested with much control in the man-agement of the engine and of the train.

This statute has often been construed as bearing upon the authority

of the engineer of a train, and in every case, so far as my research has extended, he has been held to be a vice principal within the purview of the act. Breed v. Lehigh Valley R. R. Co., 131 App. Div. 492, 115 N. Y. Supp. 1019; O'Brien v. Erie R. R. Co., 139 App. Div. 291, 123 N. Y. Supp. 1040; Schradin, as Adm'r, v. N. Y. C. & H. R. R. Co., 124 App. Div. 705, 109 N. Y. Supp. 428; Simons v. Brooklyn Hts. R. R. Co., 142 App. Div. 36, 126 N. Y. Supp. 792.

And while that question was not up in Hallock v. N. Y., O. & W. R. R. Co., 197 N. Y. 450, 90 N. E. 1124, the trend of the opinion is in support of that proposition. A liberal interpretation is given to the act. Laplaca v. L. S. & M. S. R. R. Co., 127 App. Div. 843, 111 N. Y. Supp. 797, affirmed 194 N. Y. 562, 87 N. E. 1121; Inglese v. N. Y., N. H. & H. R. R. Co., 133 App. Div. 198, 117 N. Y. Supp. 392.

My conclusion is that the engineer was a vice principal, and therefore the alter ego of the defendant; that the command which he gave to this inexperienced plaintiff was negligence in view of the circumstances; that the train was not running more than ten miles an hour; that the plaintiff was not guilty of contributory negligence as matter of law in obeying the direction of his superior and jumping off the running board, believing as he did that he could do so with safety; and that the defendant is therefore liable.

The judgment should be affirmed.

Judgment and order affirmed, with costs. All concur, except WILLIAMS, J., who dissents.